## Martínez *v.* Pagán López & Co.

Apelación procedente de la Corte de Distrito de Mayagüez.

No. 615.—Resuelto en abril 27, 1911.

CONTRATO—COMPRA-VENTA MERCANTIL—CONSUMACIÓN DEL CONTRATO.—Apareciendo de la prueba practicada en este caso que el demandante entregó a los demandados la factura de 191 sacos de azúcar que les vendiera especificando el número, peso, grado, precio y cantidad total debida; que los demandados la recibieron sin objeción alguna; que el guarda-almacén fué notificado que el azúcar quedaba por cuenta de los demandados, a quienes había sido vendida, y que éstos dispusieron de parte de la misma, hay que estimar entregada la mercancía, y consumado el contrato de compra-venta mercantil, y la pérdida del azúcar, ocurrida después de consumado el contrato ha de ser de cuenta de los demandados, siendo de aplicación el artículo 333 del Código de Comercio.

ID.—No es de aplicacion a este caso el artículo 334 del Código de Comercio, porque habiéndose pesado el azúcar por el guarda-almacén al recibirla, la cantidad total que se hallaba en depósito fué puesta a disposición de los demandados con entrega de la factura expresiva del peso de los sacos y del número de quintales de cada grado, así como del precio de cada uno y de la suma total que debía el comprador, y nada más tenía que hacer el demandante, según los términos del contrato, para que éste se estimara perfeccionado, quedando desde entonces, depositada la mercancía por cuenta y riesgo de los compradores.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. Fernando Vázquez, N. B. K. Pettingill y Henry F. Hord.*

Abogado del apelado: *Sr. Pascasio Fajardo.*

El Juez Asociado Sr. MacLeary, emitió la opinión del tribunal.

En este caso el demandante Martínez estableció su demanda contra la mercantil Pagán López y Compañía con el fin de obtener un saldo de novecientos cincuenta dollars ($950), que se alega deben los demandados al demandante, con motivo de una cuenta corriente por mercaderías vendidas y entregadas por el demandante a los demandados. Los demandados niegan deber suma alguna al demandante.

En 15 de agosto de 1910, la corte inferior dictó sentencia a favor de los demandados en la forma siguiente:

"Esta causa fué llamada para juicio el día once de agosto de 1910, compareciendo el demandante por sus abogados Pettingill, Cornwell y Vázquez y la demandada por el abogado Don Pascasio Fajardo. Oídos los alegatos, la prueba practicada y los informes de los abogados concurrentes, la corte reservó su resolución.

"De la prueba practicada en el presente caso, resulta que Angel Martínez celebró un contrato el día 31 de mayo de 1910 con Pagán López y Compañía mediante el cual el demandante vendió a la sociedad demandada, ciento noventa y un sacos de azúcar de segunda y tercera, a tres dollars setenta centavos quintal la de segunda y tres dollars diez centavos quintal la de tercera, estando este azúcar depositada en la Mayagüez Sugar Company por cuenta de Don Rafael Blanch. De esta azúcar retiró la sociedad demandada la cantidad de setenta y seis sacos, hasta el día 9 de junio de 1910, por la noche, en que ocurrió un incendio en el almacén de la Mayagüez Sugar Company, quedando la referida azúcar totalmente destruída. No consta que la azúcar de referencia fuese pesada luego de haber sido vendida a la demandada. El demandante alega que la pérdida de dicho fruto, corresponde a la demandada Pagán López y Compañía, quien sostiene lo contrario, alegando que la azúcar no fué pesada ni recibida. Es evidente que entre ambas partes a esta acción, existió un contrato perfeccionado, desde el momento en que ambos convinieron en la cosa objeto del contrato y en el precio de la misma, aunque el fruto no hubiese sido entregado, pero entendemos que es aplicable a este caso el artículo 334 del Código de Comercio según el cual, los daños y menoscabo que sufran las mercaderías, aún por casos fortuitos, serán por cuenta del vendedor, si la venta se hubiera hecho por número, peso,

o medida.  De acuerdo con la letra y espíritu de este artículo, entendemos que no debe imputarse al comprador el riesgo de la mercadería vendida, hasta tanto que se haya pesado, contado o medido.  No es necesario que se hayan entregado ni la cosa ni el precio para que el contrato de compra-venta se tenga por perfeccionado.  Desde que se consiente y sin necesidad de ninguna otra circunstancia, el contrato queda perfecto y nacen las obligaciones; pero la trasmisión de la propiedad no existe, a nuestro entender, hasta que la cosa no ha sido pesada, contada  o medida en los casos en que es aplicable el artículo 334 del Código de Comercio antes citado.

"En resumen, creemos que entre ambas partes contratantes existió un contrato de compra-venta perfeccionado, pero nó un contrato consumado.

"Por las razones expuestas, hoy día 15 de agosto de 1910, la corte declara que la ley y los hechos están a favor de la demandada y sin lugar esta demanda, sin especial condenación de costas."

Contra esta sentencia el demandante prontamente interpuso apelación, consignando un error en su alegato que literalmente es como sigue:

"La corte erró, al estimar que entre Angel Martínez y la sociedad Pagán López y Compañía, no existió un contrato consumado de compra-venta, de 191 sacos de azúcar, a precio convenido de $3.70 una clase y $3.10 otra, cada quintal, con el precio expresado en la factura."

De la consideración que la corte inferior ha hecho del caso y del error alegado por el apelante y presentado a la resolución de este tribunal, la cuestión estriba principalmente en los hechos y en la debida interpretación de la prueba presentada durante la celebración del juicio.  Por tanto, debemos examinar los hechos del caso.

Los hechos no controvertidos son que Angel Martínez, demandante, tenía en 30 de mayo de 1910, en el almacén de la Mayagüez Sugar Co. en el pueblo de Mayagüez, ciento noventa y un (191) sacos de azúcar de diferente calidad; de segunda y de tercera.  Había ciento sesenta y un (161) sacos de segunda a $3.70 el quintal y treinta (30) sacos de tercera, a $3.10 quintal.  Cada saco pesaba cerca de doscientas (200) libras aproximadamente.

No hay duda alguna de que las partes en este pleito celebraron en 31 de mayo de 1910, un contrato por virtud del cual el demandante vendió a los demandados ciento noventa y un (191) sacos de azúcar de 2ª. y 3ª. a $3.70 y $3.10, el quintal, respectivamente, azúcar que estaba entonces almacenada en el almacén de la Mayagüez Sugar Co. Que de este azúcar retiró la sociedad demandada setenta y seis (76) sacos, en el término de diez días; y en la noche del 9 de junio de 1910, ocurrió un fuego en el almacén de referencia quedando la referida azúcar totalmente destruída.

Esta controversia se originó con motivo de la pérdida del azúcar por el fuego. Alega cada parte que la otra debe sufrir la pérdida. Por tanto, la cuestión se reduce a determinar si fué entregada o nó el azúcar y efectuada enteramente la entrega de la misma.

Los demandados alegan que aunque el contrato quedó perfeccionado no fué consumado, debiendo entregarse el azúcar de tiempo en tiempo, según fuera vendida, la que había de pesarse a medida que se entregara y pagara, a intervalos de diez días, de conformidad con la cantidad que así se recibiera y vendiera por ellos.

El demandante alega que la venta del azúcar se efectuó, según dicho artículo se encontraba en el almacén; que ya había sido pesada dicha azúcar por el guarda-almacén y entregado por el demandante a los demandados una factura especificándose en ella el número de sacos y el peso de cada clase, precio y otros particulares, factura que fué aceptada por los demandados sin protesta u objeción ninguna, y que mostraba que la suma debida era de $1,712.13. La corte inferior sostuvo la teoría sustentada por los demandados dictando sentencia de conformidad con la misma.

El demandante, Angel Martínez, declaró como sigue:

"Que le presentó al socio de la casa Sr. Peregrino López, dos muestras de azúcar; una de ciento sesenta y un sacos segunda y otra de treinta sacos tercera; que la llevó a su oficina, se las presentó allí y le pidió precio por ambas y el Sr. López aceptó el precio y cantidad

de sacos de las dos clases, de tres setenta una y otra tres diez. Que le ofreció en venta esa azúcar, y se la compraron, y el Sr. López tomó nota en las mismas muestras, de la cantidad de sacos que era de cada clase. Que la venta quedó concertada en ese mismo momento. Que solamente le hizo saber la parte en que estaba y que no siendo almacén de él, desde luego allí avisaría que la pusieran a su disposición para que dispusiera de ella y se la cargaría en cuenta. Que el azúcar estaba en el almacén de la Mayagüez Sugar Company, a quien se le había comprado. Que le compró la azúcar a Rafael Blanch y él la había comprado a la Mayagüez Sugar Company. Que le hizo saber entonces al Sr. López que la azúcar estaba allí almacenada y que avisaría al Sr. Monefeld para que se la entregara a él. Que el Sr. López como representante de esa casa Pagán López y Compañía, aceptó el azúcar donde estaba. Que el azúcar quedó por cuenta de esa casa, y al día siguiente, porque esa operación fué hecha el día treinta por la tarde, y al día siguiente el testigo pasóle la factura y tiene entendido que el Sr. López dispuso de parte de la azúcar, que no sabe si de mucha cantidad o de poca, en el tiempo que le pasó factura, o sea el día treinta y uno de mayo. Que ese día que hicieron ellos el trato quedó la azúcar por cuenta de los Sres. Pagán López y Compañía, que él les dijo que la azúcar estaba allí a su disposición. Que ellos aceptaron lo que el testigo les dijo. Que él les dijo que estaba en el almacén de la Mayagüez Sugar Company.

"Que les entregó la factura al día siguiente en que aparece cargada en el libro. Que no se lo entregó personalmente, sino uno que era su empleado, Hiram Arroyo. Que en esa factura dice el peso de la azúcar, el número de quintales que tenía, el precio y el total de la factura.

"Que él hizo un asiento en sus libros de esa operación, que lo hizo en los dos que tiene. Que tiene en la mano el borrador diario de su casa. Que el asiento respecto a esa operación de azúcar con Pagán López y Compañía está hecho en treinta y uno de mayo. Que entre otros asientos, en la misma fecha, aparecen treinta sacos azúcar tercera, Mayagüez Sugar Company, siete mil cuatrocientos noventa y cinco libras, a tres diez, doscientos treinta y dos dollars, treinta y cinco centavos y ciento sesenta y un sacos segunda con treinta y nueve mil novecientos noventa y cuatro libras, a tres setenta, mil cuatrocientos setenta y nueve dollars setenta y ocho centavos. En total mil setecientos doce dollars trece centavos. Que esa cantidad aparece cargada a Pagán López y Compañía.

"Que además de ese borrador lleva el libro dè cuentas corrientes.

Que anotó esa operación en mayo treinta y uno en su libro de cuentas corrientes. Que le anotó la cantidad de mil setecientos doce dollars en deber de la cuenta de Pagán López y Compañía por concepto de azúcar vendida. Que son ciento sesenta y uno de segunda, y treinta de tercera; y aparecen otras operaciones en el mismo día.

"Que les compró doce sacos de azúcar a Pagán López y Compañía después de la venta que les hizo y que se los compró a tres setenta y siete y medio. Que ellos le pasaron una factura de esa azúcar, que es la misma clase que el testigo les vendió a ellos, y se la vendieron a tres setenta y siete y medio y él se la vendió a ellos a tres dollars setenta centavos, y que la tiene abonada en su cuenta.

"Que el azúcar, antes de llevarse al almacén de la Mayagüez Sugar Company estaba pesado, que conocía perfectamente el peso que tenía la azúcar y que lo pesó el empleado de la Mayagüez Sugar Company, Don Gerardo Monefeld. Que con el peso ese que tenía la azúcar fué que le pasó la factura, y que ellos no le hicieron ninguna objeción, ni tampoco le hicieron ninguna objeción a que quedara el azúcar allí por cuenta de ellos. Al vendérsela, le dijo el testigo, que estaba allí, que había avisado a Don Gerardo para que la pusiera a su disposición. Que le dió aviso a Don Gerardo Monefeld para hacerle saber que la azúcar estaba a disposición de Pagán López y Compañía. Que Don Gerardo Monefeld es apoderado de la Mayagüez Sugar Company o de Don Oscar Bravo y él es el que está encargado del almacén.

"Que ha manifestado que esa azúcar estaba pesada y entregada en el almacén de la Mayagüez Sugar Company, y que fué pesada por Don Gerardo Monefeld. Que no sabe si los Sres. Pagán López y Compañía o alguna persona perteneciente a la casa de Pagán López y Compañía, presenció el peso de esa azúcar. Que sabe que fué pesada porque el Sr. Monefeld pasó factura a la casa del testigo, y por la misma cantidad que él cargó al testigo, éste la pasó a Pagán López y Compañía. Que a él no le consta que Pagán López y Compañía haya presenciado peso de esa azúcar, que no la pesó delante de ellos y que le ordenó a Don Gerardo que se la entregara.

"Que él recuerda que antes del fuego, Don Gerardo mandó preguntar si podía entregarle azúcar a Pagán López y Compañía de la que tenía allí, y el testigo le dijo que se la podía entregar toda, porque había sido vendida. Que no le consta si en el almacén no había más que esa azúcar.

"Que después del treinta y uno de mayo, el testigo necesitó doce sacos de una de las clases y se la compró al Sr. López, los doce sacos

y él le preguntó que a cómo la había vendido para partir la diferencia del beneficio; le manifestó que era a tres ochenta y cinco y dijo: 'pues gánese siete centavos y medio, y yo lo mismo,' y el testigo lo aceptó.''

El encargado del almacén, Gerardo Monefeld, testigo del demandante, declaró como sigue:

''Que conoce a Angel Martínez y que la Mayagüez Sugar Company, a sus sabiendas, vendió a Blanch y a Martínez, o uno de los dos, doscientos sacos de azúcar de segunda y treinta sacos de tercera hacia el mes de abril; y de parte de esa azúcar iba disponiendo uno de los dos indistintamente por medio de su dependiente, hasta tanto que solicitó el fruto Pagán López y Compañía y entonces envió el testigo a averiguar de esos dos compradores del fruto si procedía su entrega, puesto que no tenía orden ninguna escrita de ninguno de ellos, y contestaron que habían vendido el resto que les quedaba a dichos Sres. Pagán López y Compañía y después de eso fueron llevando distintas partidas.

''Que el almacén se quemó con todo su contenido, en diez de junio. Que quince o veinte días, no puede precisar, antes de esa fecha del incendio, Angel Martínez le dijo que la azúcar era de la cuenta de Pagán López y Compañía.    Que Angel Martínez no le manifestó nada; que él envió la razón a esos señores, manifestándole que disponía Pagán López y Compañía del fruto que era, a mi juicio, de su propiedad, y le mandaron razón con el mismo dependiente, que le había sido vendido a ellos y, que se le ocurrió mandarle a decirles esto, porque vino ese dependiente con una orden de Pagán López y Compañía para la entrega a Martínez, por cuenta de Martínez, de doce sacos, de esos doce sacos que el testigo tenía hasta entonces de su propiedad.    Martínez trajo una orden de Pagán López y Compañía, para la entrega de esa azúcar, por consiguiente, esto le daba a entender que había sido vendida a Pagán López el fruto que antes era de Martínez y Blanch y entonces le respondieron que efectivamente, había sido vendido el resto del fruto; y siguió después Pagán López disponiendo del fruto a su favor.    Que no puede decir cuantas veces dispuso Pagán López de azúcar, pero varias veces de cinco y de seis, número de sacos de azúcar.    Que el azúcar, que tenía allí Pagán López y Compañía pesaba alrededor de doscientos cincuenta libras cada saco, algo menos.    Se pesaba cada vez que se entregaba un lotecito.    Que no sabe cuanto pesaba toda la azúcar que tenía Pagán

López y Compañía que le había vendido Angel Martínez, que tenía tomada nota de cuantos sacos eran de Pagán López y Compañía y tenía anotaciones de todo eso, pero se quemaron. Que esa azúcar estaba pesada por el encargo del testigo, que estaba pesada toda. Que el peso ese constaba en la libreta que llevaba el testigo, en la misma libreta en que se entraba todo el fruto de la cosecha de la Mayagüez Sugar Company. Que Angel Martínez no ha ido a solicitar azúcar ninguna, sino el dependiente suyo, llevándole una orden de Pagán López y Compañía.

"Que entregada el azúcar por solicitud de Pagán López y Compañía por conducto de su dependiente. Que la autoridad de Pagán López y Compañía para pedir entrega de esa azúcar venía de su oficina. Que el conocimiento del testigo de que ellos eran dueños venía del comprador de la Mayagüez Sugar Company, de Blanch a quien envió en solicitud de tal informe para que le comunicara si el fruto era suyo, continuaba siendo suyo o si lo había vendido en parte o en conjunto a los Sres. Pagán López y Compañía, y les respondieron que habían vendido el resto a Pagán López y Compañía, que quien respondió fué el dependiente. Que cuando Pagán López y Compañía pidieron partidas de azúcar, algunos sacos, no mandaron ninguna orden que el testigo recuerde."

Rafael Blanch, pariente y anterior socio del demandante, como testigo de éste último, declaró lo siguiente:

"Que le compraron una azúcar y luego de vender parte de ella el testigo le vendió a Angel Martínez el resto que quedaba. Que le compraron á la Mayagüez Sugar Company unos doscientos cincuenta sacos más o menos, y que el resto que le vendió Angel Martínez eran unos doscientos sacos, y que el referido azúcar estaba en los almacenes de Schroder y Ca. que le vendió ese resto a Martínez en treinta de mayo y que éste se la vendió a Pagán López y Compañía. Que esa azúcar quedó depositada en el almacén de Schroder y Ca. y que está por cuenta de Pagán López y Compañía.

"Que sabe por ciencia propia que esa azúcar fué vendida a Pagán López y Compañía porque vió que en esa época Martínez le pasó borderó de toda la azúcar de él que quedaba en casa de Schroder y Ca.

"Que vió el borderó cuando se lo pasó Martínez, y que vió el peso que tenía el borderó, pero que no lo podría precisar. Que tenía el peso y también el número de sacos, que no lo puede precisar pero que tenía sacos, peso y calidad, porque habían dos calidades. Que ve con

frecuencia a Pagán López.y Compañía y que hablaron de negocios en tono general. Que respecto a esa operación le dijo al testigo, que ellos creían no tener que pagar el azúcar, porque no podían pagar más que la que habían dispuesto. Que eso fué posteriormente al siniestro, después del fuego. Que él habló con Peregrino López.''

Hirám Arroyo, empleado de Martínez, declaró a favor del demandante como sigue:

''Que estaba allí el treinta y uno de mayo de este año. Que ese día le llevó a Pagán López y Compañía por encargo de Martínez una factura de unos sacos de azúcar, vendidos a Pagán López y Compañía. Que él mismo había hecho. Que el azúcar se había vendido a Pagán López y Compañía. Que la factura tenía el peso, el precio y el número de sacos. Que le entregó esa factura al Sr. Peregrino López. Que ese señor está presente y que le dijo que estaba bien.''

Peregrino López, uno de los demandados, al ser llamado por el demandante como testigo, declaró:

''Que tiene conocimiento de que esa casa haya vendido azúcar a Don Angel Martínez, que eran varias partidas. Que en el mes de de julio de este año, hubo una partida de doce sacos de azúcar que la casa no le vendió a Angel Martínez, que había sido vendedor de un lote de azúcar, vendió doce sacos y después de vendidos, los ha solicitado en su casa, del mismo azúcar que les había vendido, que le expidió una factura de eso, que esa es la factura.

''Que Pagán López y Compañía tenía comprado a Don Angel Martínez, una cantidad de azúcar, cuya azúcar estaba almacenada en los depósitos de la Mayagüez Sugar Company. Pagán López y Compañía podía, de acuerdo con lo convenido, disponer de cantidades parciales.

''Que el día cuatro o tres, el Sr. Martínez vino a la oficina del testigo a informar que había vendido doce sacos de azúcar al Sr. Montalvo de San Germán, con un aumento de precio de quince centavos más del que se le había vendido a Pagán López y Compañía. Al oir eso, el testigo objetó, porque no creía prudente que una azúcar que estaba comprometida con Pagán López y Compañía, estuviera libremente para venderla por otro lado; entonces el Sr. Martínez le propuso al testigo partir la diferencia de la totalidad, a lo cual no tuvo oposición el testigo, y ordenó que la anotaran al Sr. Martínez en su cuenta los doce sacos de azúcar al precio convenido con Pagán López y Compañía.''

Los demandados por su parte, presentaron la siguiente prueba. Peregrino López, socio gestor de los demandados, declaró en la siguiente forma:

"Que ha tenido muchas clases de negocios mercantiles con Don Angel Martínez a fines del mes de mayo del corriente año. Que las condiciones del negocio son las siguientes: Que el Sr. Martínez, el día 30 de mayo se personó en la oficina del testigo con dos muestras de azúcar, ofreciéndoselas, ciento setenta y unos sacos de una clase segunda y treinta sacos de clase tercera, al precio de tres setenta una y tres diez la otra. Naturalmente, ante la confianza que había con el Sr. Martínez, le manifestó el testigo que no le convenía la operación violenta y el Sr. Martínez accedió para que esta azúcar fuese tomada por cantidades parciales, a comodidad de Pagán López y Compañía y pagada cada diez días la cantidad que fuera tomando. A este fin, encargó que las liquidaciones ó documentos que acreditasen el peso, que expidiera la Mayagüez Sugar Company fuesen archivados con cuidado, para los efectos de la liquidación. Después, el 9 o 10 de madrugada, sucedió un siniestro en este edificio, habían tomado setenta sacos. Que el testigo tiene ahí una relación de la azúcar tomada y la cual había visto el Sr. Martínez y le dijó al testigo que aquella azúcar era a cuenta y riesgo del testigo y le propuso varias transacciones y él solamente le dijo que le sometía á un tribunal de derecho, que diera la razón a quien la tuviera. Que el Sr. Martínez le giró por la cantidad que había dispuesto de azúcar, que se la pagó, giró por otras cantidades que el testigo no creía deber y ha rechazado los giros. Que ninguna persona por orden del testigo como gestor de la casa Pagán López y Compañía fué al sitio donde se encontraba esa azúcar para recibir esa azúcar. Que él ha dispuesto de cantidades parciales de esa azúcar, desde la fecha en que hicieron el negocio, hasta que ocurrió el siniestro. Que esas cantidades parciales eran entregadas por cuenta del testigo y la Mayagüez Sugar Company era quien pesaba al entregarla. Que ha visto unos documentos privados que han sido reconocidos por Don Gerardo Monefeld y que éstos están en poder de Pagán López y Compañía.

"Que al pagar el testigo, ese giro de quinientos dollars expedido por el Sr. Angel Martínez a cargo del testigo y en cuenta a cobrar del Banco Colonial, quedaba debiéndole al Sr. Martínez veinte y siete pesos y centavos, y que esa cantidad la han consignado en manos del Notario Rodolfo Ramírez Vigo, por una protesta de un giro de cincuenta pesos, por falta de pago.

"Y continúa respondiendo el testigo al demandado: Que como comerciante tiene libros. Que ha manifestado que había comprado una azúcar al Sr. Angel Martínez. Que le informó Angel Martínez que esa azúcar estaba depositada en el almacén de la Mayagüez Sugar Company. Que el precio ya lo tiene manifestado antes. Que era obligación del testigo por la compra de ese fruto liquidar cada diez días la cantidad que se fuera tomando del depósito donde estaba. Que cuando hizo la negociación con el Sr. Martínez de doscientos y pico de sacos, ni el testigo ni ninguna persona enviada por él pesaron ese fruto. Que los pesos que se hicieron de ese fruto eran parciales, según la cantidad que se tomaba. Que el día que ocurrió el incendio había tomada setenta sacos de la segunda y seis de la tercera, setenta y seis por todo. Que el día diez después del incendio dispuso el Sr. Martínez de una pequeña cantidad de cuarenta y pico de dollàrs, hasta el día once en que se le presentó un giro de quinientos duros a la vista, que lo pagó. Que ese mismo día hizo una liquidación de la cuenta y de la liquidación, después de pagado el giro, quedaban veinte y siete pesos.

"Que el día once hizo una liquidación de la azúcar tomada. Que la hizo de acuerdo con los vales que tenía. Que liquidó el azúcar que se había tomado sin intervención de Martínez, para acreditar su montante en la cuenta del Sr. Martínez y también para averiguar el valor de las partidas que había sacado. Que no sabe si el demandante Sr. Martínez ha aceptado o recibido esa suma de veinte y siete y pico de dollars que el testigo consignó en manos del notario. Que en el contrato celebrado entre Martínez y el testigo no había ninguna estipulación de vender el fruto en tiempo limitado."

En vista de estos hechos debemos llegar a la conclusión de que se hizo la entrega del azúcar vendida. La factura fué prontamente enviada al comprador especificándose en la misma todos los particulares de la venta, número de sacos, peso, clase, precio, y la cantidad total debida, factura que fué recibida sin objeción de ninguna clase. Pocos días después, necesitando el demandante doce sacos de azúcar de la clase vendida las compró de nuevo a los demandados, a precio más subido, las que volvieron a entregarse al guarda-almacén por orden de los demandados. El traspaso de los ciento noventa y un (191) sacos se hizo debidamente, en primer lugar, por orden que recibiera el guarda-almacén del demandante, de

retener todo el azúcar a disposición de los demandados, notificándole que se había vendido a ellos. Los demandados admiten haber retirado y vendido setenta y seis (76) sacos de azúcar por los que voluntariamente pagaron setecientos sesenta y dos dollars, trece centavos ($762.13). La corte sentenciadora hace depender la resolución del caso del hecho, según ha sido probado, de que "No consta que el azúcar de referencia fuese pesado luego de haber sido vendido a la demandada." En las circunstancias del caso no es esta una cuestión vital. El azúcar había sido ya pesado por el encargado del almacén al tiempo de recibirlo para su almacenaje, habiendo el vendedor entregado al comprador una factura especificando no solamente el peso del azúcar en detalle, dando el número de quintales de cada clase, sino que también su precio y la cantidad total debitada por el comprador al vendedor. Sin embargo, no había necesidad de pesar, según las condiciones de la venta. Al demandante no le quedaba nada más que hacer respecto a la transacción. A él no le correspondía trasportar el azúcar desde el almacén a la tienda de los demandados. Al comprador le tocaba trasportar la mercancía del almacén siempre que le conviniere llevarla a su tienda o entregarla a un comprador. Esto fué lo que hizo en el caso de setenta y seis sacos de azúcar por los cuales pagó sin objeción alguna. El azúzar quedaba en el almacén, en el momento del fuego, de cuenta y riesgo de los demandados, de acuerdo con el artículo 333 del Código de Comercio. Después de la venta y de la entrega de la factura, no teniendo el demandante nada más que hacer para completar la venta, ésta quedó consumada con arreglo a la práctica universal observada por los comerciantes en estos casos; y de no haber ocurrido el fuego, jamás hubiera habido controversia alguna con respecto a esta cuestión. No hay duda de que esta fué una transacción comercial, según la define el artículo 325 del Código de Comercio, y de que este caso está regido por dicho Código. Los artículos 333 y 334 del Código de Comercio dicen lo siguiente:

"Artículo 333.—Los daños y menoscabos que sobrevinieren a las mercaderías, perfecto el contrato y teniendo el vendedor los efectos a disposición del comprador en el lugar y tiempo convenidos, serán de cuenta del comprador, excepto en los casos de dolo o negligencia del vendedor.

Art. 334.—Los daños y menoscabos que sufran las mercaderías, aún por caso fortuito, serán de cuenta del vendedor en los casos siguientes:

"1. Si la venta se hubiere hecho por número, peso o medida, o la cosa vendida no fuere cierta y determinada, con marcas y señales que la identifiquen.

"2. Si por pacto expreso o por uso del comercio, atendida la naturaleza de la cosa vendida, tuviere el comprador la facultad de reconocerla y examinarla previamente.

"3. Si el contrato tuviere la condición de no hacer la entrega hasta que la cosa vendida adquiera las condiciones estipuladas."

La única cuestión que envuelve la resolución del caso, es cuál de los dos artículos citados debe aplicarse a los hechos probados en la vista. Los apartados 2 y 3 del artículo 334 es evidente que no tienen referencia a los hechos que se encuentran probados en el récord. El primer apartado de dicho artículo se aplicó por la corte sentenciadora al caso ante ella pendiente, porque la mercancía no había sido pesada después de la venta. Según lo dispuesto por la ley misma, esto es solamente necesario cuando se hace la venta por peso, número o medida; como por ejemplo, cuando un comprador celebra un contrato por mil libras de trigo para ser tomadas de una partida que contenga muchos miles de libras o de un cargamento acabado de llegar y que todavía no se sabe que contenga una cantidad dada de mercancías. Pero en el caso pendiente ante nosotros, la partida entera, propiedad del vendedor y depositada en el almacén, que pertenecía a un tercero, fué objeto de la venta. No quedaba nada por hacer en el sentido de pesar, contar o medir para consumar el contrato de venta. No había necesidad de pesar, porque la partida había sido pesada en su totalidad o en grueso y estaba ya completamente separada. Los principios del Código de

Comercio, según se exponen en el artículo 334, son en substancia idénticos a los que regían en la ley común. En el caso de *Acraman* v. *Morrice* (8 C. B. 449), el tribunal inglés, por medio del Juez Wilde, dice: "En un contrato sobre la venta de mercancías, mientras quede algo que hacer por el vendedor a dichas mercancías, la propiedad de dichas mercancías no se transfiere y el vendedor tiene el derecho de retenerlas." (Shirley's Leading Cases, p. 202.) La recíproca es también cierta, según se desprende del caso de *Tarling* v. *Baxter,* en la página anterior de dicho tomo, donde se expresa: "La regla de ley," dice Bailey, J., "es que, cuando existe una venta inmediata, nada le queda que hacer al vendedor por lo que respecta a él y al comprador, la propiedad de la cosa vendida queda en el comprador, y desde luego se siguen todas las consecuencias que resultan del hecho de tener la propiedad, una de las cuales es que si se destruye, la pérdida es por cuenta del comprador." Desde luego, si hubiera resultado haber habido un error en el peso, según fué suministrado por el encargado del almacén, habría tenido que hacerse una corrección del montante del precio de compra, de acuerdo con el artículo 336 del Código. Pero en el caso que nos ocupa la pérdida ocurrió después de haberse consumado el contrato y estar la mercancía a disposición del comprador, y los daños deben ser de cuenta del comprador, según lo prescrito en el Código de Comercio.

La operación está comprendida en las disposiciones del artículo 333 del Código de Comercio y nó en el artículo 334 de dicho Código, según opinó la corte inferior.

Por tanto, habiendo cometido error la corte inferior en la aplicación de la ley a los hechos de este caso, así como en la apreciación de los hechos, según resultaron del juicio, debe revocarse la sentencia apelada y dictar este tribunal la que proceda a favor del demandante por la suma reclamada.

*Revocada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y de Aldrey.